**DALLAS CITY PACKING, INC., et al., Plaintiffs,**

v.

**Earl BUTZ, Individually and as Secretary of Agriculture, et al., Defendants.**

Civ. A. No. 3–75–0578–G.

United States District Court, N. D. Texas, Dallas Division.

Feb. 22, 1976.

---

5. During the period of litigation Martz paid the plaintiff as a credit on his account the sum of $1000.00.

Lamar Holley and Stephen L. Holley, Holley & Holley, Dallas, Tex., for plaintiffs.

Marshall M. Marcus, Atty., John C. Chernauskas, Director, Marketing Div., Dept. of Agriculture, Washington, D. C., for defendants.

## MEMORANDUM OPINION

PATRICK E. HIGGINBOTHAM, District Judge.

### I.

1. The Parties and the Dispute.

On February 23, 1976, the United States Department of Agriculture (USDA) will implement new standards for the grading of meat. The power to establish standards for meat grading is granted to the Secretary of Agriculture by the Agricultural Marketing Act of 1946, 7 U.S.C. § 1622, as amended. Seventeen meat packers whose businesses are principally in the southwest portion of the United States and whose main product is "baby beef" seek to enjoin the proposed regulations and have them declared invalid.

The proposed regulations have proceeded through the usual process of informal rulemaking.[1] On September 11, 1974, the proposed rules were published in the Federal Register (39 F.R. 32734). *See*, 7 C.F.R. 53.100–53.105. During the September 11 to December 10, 1974, "notice" period, 4,000 separate written comments were received, together with various research studies.

---

1. There are four degrees of formality in agency decisions with differing legal prerequisites and consequences. The four are: nonformalized decision making, 5 U.S.C. Sec. 553(a), (b)(A), (b) (1970), and Agency acts outside of "rate", "order", "adjudication", "license" or "sanctions." *See,* 5 U.S.C. Sec. 551(4), (6), (7), (8), (10) (1970); informal rulemaking (5 U.S.C. Sec. 553(c) (1970) ); and adjudication, 5 U.S.C. Sec. 554 (1970).

On November 27, 1974, President Gerald Ford issued Executive Order No. 11821 (Ex. Order) requiring government agencies to consider the inflationary impact of any new agency rules. On March 12, 1975, the USDA published the statement that:

The inflationary impact of these revisions of the guide standards has been evaluated. 40 F.R. 11547.

While the general history of meat grading has been set out in other court opinions[2] a brief review is essential to provide an environment conducive to understanding this dispute. While beef grading did not officially begin until May, 1927, with the Secretary of Agriculture publishing standards in June, 1927, tentative standards have been formulated as early as 1916. These standards for the grading of meat were amended from time to time in response to changing production techniques and greater experience in grading. Seven changes in the classification of meat have been made to date (1939, 1941, 1949, 1950, 1956, 1965, 1973). The USDA description of the 1965 change illustrates these changes and is otherwise pertinent here:

"The official standards for grades of steer, heifer, and cow beef were revised in June 1965 to place less emphasis on changes in maturity in the Prime, Choice, Good, and Standard grades. This change was made to reflect the latest research information available regarding the effect of maturity on beef palatability. The minimum marbling permitted in these grades was not changed for the very youngest beef. However, the rate of increase in required marbling to offset increasing maturity was changed, and the minimum marbling permitted was reduced for more mature carcasses by as much as 1½ degrees in Prime, 1 degree in Choice, and ¾ of a degree in Good and Standard. In addition, the revision eliminated consideration of the two degrees of marbling in excess of that described as abundant. The manner of evaluating conformation also was clarified by providing that carcasses may meet the conformation requirements for a grade either through a specified development of muscling or a specified development of muscling and fat combined. This revision also included a requirement that all carcasses be ribbed prior to grading and made other minor changes to clarify the intent of the standards and simplify their application. An added provision established standards for cutability grades of carcasses and certain wholesale cuts of all classes of beef. A dual grading system for beef carcasses, involving separate identification of differences in quality and in cutability, had been proposed by the Department in April 1962 and made available for use on a trial basis for one-year period beginning July 1, 1962. The cutability standards adopted in 1965 were similar to those included as a part of the dual grading system, but modified on the basis of comments from industry and experience gained during the trial period of the dual grading system." Reprint, Off. U. S. Standards For Grades of Carcass Beef, Sec. 53.100–53.105 C.F.R.

In 1946 Congress enacted the Agricultural Marketing Act, 7 U.S.C. Sec. 1621, et seq., authorizing the Secretary of Agriculture to "inspect, certify, and identify the class, quality, quantity, and condition of agricultural products . . . under such rules and regulations as (he) may prescribe . . ." The Act also authorized the Secretary to issue regulations:

" . . . to the end that agricultural products may be marketed to the best advantage, that trading may be facilitated, and that consumers may be able to obtain the quality product which they desire, except that no person shall be required to use (this) service . . . ." 7 U.S.C. Sec. 1622(h).

There are two general but separate evaluations involved under the present system of grading beef. First, "cutability" or percentage from a carcass of

2. See, *Independent Meat Packers Assn. v. Butz*, 526 F.2d 228 (8th Cir. 1975), and Judge Denney's opinion in the same case at 395 F.Supp. 923 (D.Ct.Neb.1975).

trimmed boneless cuts to be sold at retail, or the "yield" of a carcass. Second, palatability indicating characteristics or the "quality" of a carcass. Marbling (dispersion of fat) and maturity[3] (the age) of the slaughtered animals are the yardsticks of quality. It is one aspect of quality grading that is here in issue. While it was generally believed by USDA[4] that to retain palatability, marbling must increase with maturity, the relationship between the two is the subject of some disagreement and has been the focus of considerable research.

For example, one study of beef of A (9 to 30 months), B (30 to 48 months) and E (the most mature beef), maturities reported:

"Although samples from the most youthful carcasses were more tender than those from the more mature carcasses, differences in tenderness between samples in either selection classes in the A and B maturity groups were of small magnitude and not linearly related to advancing maturity." Berry, J. Animal Sci. 38:507.

The quality standards are applied to classify meat by the designations: Prime, Choice, Good, Standard, Commercial, Utilty, Cutter and Canner.

The plaintiffs all slaughter, dress and sell substantial quantities of beef of the "A" category (less than 30 months) referred to as baby beef. A substantial portion of baby beef is now graded as "Good" but would be graded as Standard under the proposed rule. The "Standard" grades are not now sold through the usual retail stores because they usually confine their purchases to "Choice" and "Good" grades. The drop in grade class from Good to Standard would be caused by an increase in the marbling requirement of beef of "A" maturity.

The proposed regulations would make five basic changes:

(1) Conformation[5] would be eliminated as a factor in determining the quality grade.

(2) When officially graded, all beef carcasses (except bull carcasses) would be identified for both quality grade and yield grade.

(3) For beef carcasses from cattle under about 30 months of age (referred to in the standards as "A" maturity), the minimum marbling requirements in the Prime, Choice, and Standard grades would be the same as now required in each of these grades for the youngest carcasses classified as beef. However, for more mature carcasses in each of these grades, increases in marbling would be required for increases in maturity, but the minimum level of marbling would be decreased by one degree.

(4) In the "new" Good grade, the same principles would apply to the requirements for marbling and maturity as described for Prime, Choice, and Standard. However, the minimum marbling requirements would be increased one-half degree for the very youngest carcasses classified as beef.

(5) The maximum maturity permitted in the Good and Standard grades would be reduced and would be the same as now permitted in Prime and Choice.

Plaintiffs attack here the increase in the marbling requirement by one-half degree for the "very youngest" carcasses classed as beef. (Item 4). The dispute is highlighted by the statement of Defendant Peterson appearing in 40 F.R. 11535, March 12, 1975:

The more restrictive Good grade was supported by most producers, some

3. As stated by the USDA "To facilitate the application of this principle, the standards recognize five different maturity groups (referred to in the standards as A, B, C, D, and E) and nine different degrees of marbling (abundant, moderately abundant, slightly abundant, moderate, modest, small, slight, traces, and practically, devoid)".

4. A wisdom upon which the USDA relied in promulgating the regulations now in effect, but which is apparently no longer conventional within the USDA.

5. Conformation measures the proportion of meat to bone and proportion of weight in the more valuable parts of the carcass. *See*, 7 C.F.R. Sec. 53.155(b)(2).

cattle feeders, and many meat scientists. Principal opposition came from packers, primarily in the South and Southwest, where young, lightweight beef which qualified for the Good grade is graded to a greater extent than in other areas. Some cattlemen and university personnel from the same areas also expressed opposition to this part of the proposal. Those objecting to this change contended that it would discriminate against much of this young, lightweight, Good grade beef—that its production would require cattle to be fed longer with increased fatness and cost of production.

Plaintiffs urge that the proposed regulations are not within the power delegated by Congress to the Department of Agriculture by the Agricultural Marketing Act of 1946 and specifically 7 U.S. C.A. 1622(c) and (h); and that the Agency action is arbitrary and capricious within the meaning of 5 U.S.C. Sec. 706(2)(A), (E) (1970).

The defendants [6] at the threshold urge that this court is without jurisdiction; that the suit is against the sovereign and litigable only in the Court of Claims, and that these plaintiffs lack standing. Finally, the defendants urge that this court's review of informal rulemaking should be confined to the record made at the administrative level. If these jurisdictional blows are insufficient, defendants urge that there can be no showing of a likelihood of prevailing on the merits in that the policy choices were rational and the rules are supported by substantial evidence.

2. The Omaha Case.

The Independent Meat Packers Assn.[7] (Packers) filed suit on April 1, 1975, in the district court of Nebraska, seeking to enjoin and to have declared invalid the same regulations here in issue insofar as they require that quality graded meat also be graded for yield, alternatively

that the promulgation of the entire regulations be enjoined. The Packers urged that tying together yield and quality grading was arbitrary, capricious, not supported by substantial evidence and beyond the power of the USDA. The Packers also contended that the Secretary of Agriculture had not in its informal rulemaking complied with proposed Executive Order No. 11821.

The Eighth Circuit reversed a judgment entered by Judge Denney enjoining the regulation, finding that the executive order " . . . was intended primarily as a managerial tool for implementing the President's personal economic policies and not as a legal framework enforceable by private civil action". 526 F.2d 228, 236. The Court of Appeals then sustained the power of the USDA to decline to offer quality without yield grading over the objection that 7 U.S.C. § 1622(h) " . . . specifically provides that no person be required to use the 'service authorized by this subsection'". *Id.* It also turned back arguments that the USDA had acted arbitrarily and capriciously in promulgating the compulsory yield regulations. Finally, an effort to argue that the trial court erred in finding substantial evidence to support the new quality grade standards failed because the appellee did not cross appeal. None of those issues are before this court. As stated by the Eighth Circuit:

> " . . . the sole issue for our consideration is whether under the applicable standard of review there was an adequate basis in the administrative record for the revised *yield grade* regulations . . . ." (emphasis supplied) *Id.* at 237.

## II.

### The Court's Jurisdiction

1. Jurisdictional Argument.

 Defendants contend that this court has no jurisdiction because there is, as a matter of law, an absence of the

---

6. The defendants in their individual capacity assert their immunity stemming from government service. This does not appear to be rebutted.

7. The American National Cattlemen's Assn. (ANCA) intervened as a party-defendant and Purveyors, Feeders, Restaurants, and Consumers, intervened as party-plaintiffs.

required amount in controversy under 28 U.S.C.A. Sec. 1331.[8]

This suit challenges conduct by the federal government, but jurisdictional amount must still be shown. Even if these claims were of a constitutional dimension, plaintiffs do not, presumably because they could not, rely upon 28 U.S.C. § 1343. See *Lynch v. Household Finance Corp.,* 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972); *Oestereich v. Selective Service Board,* 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968).

No money recovery is sought. The amount in controversy is the extent of the injury to these plaintiffs to be protected. With government agents in their official and individual capacities as defendants this court will review the amount in controversy from the view of the plaintiffs'; that is the loss which they seek to avoid by injunctive and declaratory relief. While plaintiffs' discrete injuries cannot be aggregated, the amended complaint alleged the requisite jurisdictional amount as to each plaintiff. In the absence of bad faith these allegations are sufficient.

28 U.S.C. § 1337 furnishes a third jurisdictional base. It provides:

> The district courts shall have original jurisdiction of any civil action or proceeding arising under any act of Congress regulating commerce or protect-

ing trade and commerce against restraints and monopolies.

The defendants are correct in their contention that the Declaratory Judgment Act is not a source of jurisdiction but a remedy, but § 1337 as well as § 1331, as discussed above are adequate. See *General Motors Corporation v. Volpe,* 321 F.Supp. 1112 (D.Del.1970).[9]

■■■ The final threshold argument of the government is that these plaintiffs lack standing. This argument is also without merit. It is not necessary here to catalog the myriad cases explicating standing, however a review of basic principles is necessary. The initial inquiry in a standing issue is whether the basic constitutional element of concreteness compelled by Article III is met. Indeed some would suggest that this is the only proper inquiry.

The court finds that these plaintiffs will suffer direct and immediate economic loss as a result of the implementation of the regulations they here oppose. Whatever may be the mitigating effect of the ability of these plaintiffs to ultimately "pass through" to others the increased costs of adjusting to the new regulations, it is by no means clear that such will occur. In any event it provides no immediate solution and serves not to avoid but to reduce economic loss.

---

**8.** There is much to be said today for the proposition that the Administrative Procedure Act (APA) contains its own grant of jurisdiction. By necessity these cases are of federal and not state concern. See, *Aguayo v. Richardson,* 473 F.2d 1090, 1102 (2d Cir. 1973) (Friendly, J.). In fact, state courts offer an unfriendly forum at best. *See,* Arnold, The Power of State Courts to Enjoin Federal Officers, 7 Yale L.J. 1385 (1964). While this jurisdictional source may ultimately be validated, it has not to date received a warm reception in many courts. *See,* e. g., *Chaudoin v. Atkinson,* 494 F.2d 1323, 1328–29 (3rd Cir. 1974); *Bramblett v. Desobry,* 490 F.2d 405, 407 (6th Cir.), cert. denied, 419 U.S. 872, 95 S.Ct. 133, 42 L.Ed.2d 111 (1974); *Zimmerman v. United States,* 422 F.2d 326, 330–31 (3rd Cir.), cert. denied, 399 U.S. 911, 90 S.Ct. 2200, 26 L.Ed.2d 565 (1970), cited Note, Jurisdiction to Review Federal Administrative Action: District Court or Court of Appeals, 88 Harv.L.Rev. 980, 981, n. 13 (1975). It is unnecessary to bottom this court's jurisdiction upon this yet unsettled principle. Although shaky, the APA provides an alternative basis of jurisdiction to 28 U.S.C. § 1331 which does provide jurisdiction as otherwise demonstrated.

**9.** The contention that the doctrine of sovereign immunity bars this suit is without merit. This logic would preclude all judicial review under the APA despite its express grant. That is not to say that the mighty force of sovereign immunity is dead; it is well and at large, see *Gardner v. Harris,* 391 F.2d 885 (5th Cir. 1968). It is to say that here the plaintiffs seek not to compel but to halt government conduct; the sovereign has consented to the relief here sought by enacting the APA, at least to the extent that judicial review would interfere with public administration.

This finding satisfies one-half of the standard of *Association of Data Processing Service Organization, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The pertinent tests in determining standing are:

". . . whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise, . . . [and] whether the interest sought to be protected by the [plaintiff] is arguably within the zone of interests to be protected or regulated by the statute. . . ." *Id.* at 152, 153, 90 S.Ct. at 829, 25 L.Ed.2d at 187.

The second half of *Camp* is met by the fact, as hereinafter discussed, that the impact of the proposed rules upon these plaintiffs is distinguishable from others in the country. The USDA, moreover, does not dispute that these plaintiffs will be forced by the proposed regulations to alter their present business methods and consequently to their substantial expense. USDA instead disputes the *economic* impact upon them, a factual issue otherwise found against USDA and ". . . a palpable economic injury is sufficient to lay the basis for standing to sue, with or without a specific statutory provision for judicial review". *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

While the ripples of the proposed regulations will be felt by the "general public" (that ill-defined phrase which refers to that group of people who are not regulated or injured in a way distinct from others), these plaintiffs to borrow standing language from the antitrust field, both are within the target area of and will be directly injured by the proposed regulations. The proposed regulations are no carom shot but are a direct blow to plaintiffs.

### III.

#### The Present Issues

Judicial review of administrative action always requires three inquiries. First, is the action within the agency's statutory mandate; second, has the

agency adequately demonstrated the facts it relies on; third, does the agency's policy choice follow rationally from those facts. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). It has been noted that ". . . (t)he second and third reviewing tasks in effect draw the familiar distinction between judicial scrutiny of questions of fact and judicial scrutiny of questions of law . . . ." Note, *Judicial Review of the Facts in Informal Rulemaking,—A Proposed Standard,* 84 Yale L.J. 1750 (1975).

This minimal review, mandated by 5 U.S.C. Sec. 706, requires ". . . a thorough, probing, in-depth review . . . ." *Citizens to Preserve Overton Park v. Volpe, supra* at 415, 91 S.Ct. at 823, 28 L.Ed.2d at 153. That scrutiny ". . . does not end, however, with the determination that the Secretary has acted within the scope of his statutory authority. Section 706(2)(A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (1964 ed., Supp. V). To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Jaffe, supra, at 182. See *McBee v. Bomar,* 296 F.2d 235, 237 (CA6 1961); *In re Josephson,* 218 F.2d 174, 182 (CA1 1954); *Western Addition Community Organization v. Weaver,* 294 F.Supp. 433 (ND Cal.1968). See also *Wong Wing Hang v. Immigration and Naturalization Serv.,* 360 F.2d 715, 719 (CA2 1966). Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

"The final inquiry is whether the Secretary's action followed the necessary procedural requirements. Here the only procedural error alleged is the failure of the Secretary to make for-

mal findings and state his reason for allowing the highway to be built through the park." *Id.* at 416, 417, 91 S.Ct. at 823, 28 L.Ed.2d at 153.

Policy choices are reviewed only under the arbitrary and capricious standard, that is, whether there is a rational nexus between the facts and the policy chosen. *S. E. C. v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). This standard is " . . . a narrow one . . 'whether there has been a clear error of judgment . . . The court is not empowered to substitute its judgment for that of the agency . . . ' (cit. omitted) . . . The agency must articulate a 'rational connection between the facts found and the choice made . . . ' (the court) may not supply a reasoned basis for the agency's action that the agency itself has not given . . . (the court) will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned . . . (citation omitted) . . . " *Bowman Transp. v. Ark-Best Freight System,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447, 455 (1974).

Whether a "substantial evidence" standard is to be used to review the informal rulemaking of an administrative agency has not been settled. The APA requires a substantial evidence standard in formal rulemaking, adjudication and in a case " . . . otherwise reviewed on the *record* of an agency hearing provided by statute . . . " 5 U.S.C. Sec. 706(2)(E). One may ask what other administrative proceeding than formal rulemaking and adjudication produces a "record". In other words, is informal rulemaking the referent? Informality and records are not necessarily inconsistent. The Congressional history of APA strongly supports an intent by Congress that informal rulemaking generate a record.

The agency must keep a record and analyze and consider all relevant matter presented prior to the issuance of rules. The required statement of the basis and purpose of rules issued should not only relate to the dates so presented but with reasonable fullness explain the actual basis and objectives of the rules. House Comm. on the Judiciary, Administrative Procedure Act, H.R.Rep. No. 1980, 79th Cong., 2d Sess. 25 (1946).

Moreover, an agency engaged in informal rulemaking under 5 U.S.C. § 553 is conducting a hearing within the meaning of APA. *See, United States v. Florida E. Coast Ry.,* 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1972). While the issue has never become the ratio decidendi of Supreme Court decisions, the application of a substantial evidence standard to informal rulemaking has been approved in its dicta. *See, Citizens to Preserve Overton Park v. Volpe, supra; United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972); *United States v. Midwest Video Corp.,* 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972). Despite this dicta the courts of appeal have been chary of applying the standard. *See, e. g., Amoco Oil Co. v. E. P. A.,* 163 U.S.App.D.C. 162, 501 F.2d 722 (1974); *City of Chicago v. FPC,* 147 U.S.App.D.C. 312, 458 F.2d 731, cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972); *Automotive Parts & Accessories Ass'n, Inc. v. Boyd,* 132 U.S. App.D.C. 200, 407 F.2d 330 (1968), cited 84 Yale L.J. 1750, 53 n. 19. Currently the Sixth and apparently the Eighth Circuit have applied the test. *Chrysler Corp. v. Dept. of Transp.,* 472 F.2d 659 (6th Cir. 1972). One may question whether the two standards are outcome determinative particularly after the Supreme Court's command in *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 415, 91 S.Ct. at 823, 28 L.Ed.2d at 153, to engage " . . . a thorough, probing, in-depth review," to determine if the agency has made a clear error of judgment; that its policy choice was not rationally connected to the facts. Whether there is more than a semantical difference between an arbitrary and capricious standard of review and one employing a substantial evidence standard may well depend on the particular case. If not outcome determi-

native, there is no need to resolve this problem.

## IV.

Under the facts of this case, the three inquiries common to the review of all administrative action are inextricably intertwined and will be discussed together with proper regard for their differing emphases.

Plaintiffs do not quarrel with the power of the Department of Agriculture to propose new grades for the regulation of meat nor do they quarrel with the stated purpose of the precise change in issue here—the narrowing of the Good grade. Instead plaintiffs urge that the means chosen to do so miss their mark and are accordingly outside the statutory mandate[10], are without rational justification and are accordingly arbitrary and capricious within the meaning of the Administrative Procedure Act. The proposed regulations may be graphically depicted as follows:

# PROPOSED CHANGES IN THE RELATIONSHIP BETWEEN MARBLING, MATURITY, AND QUALITY GRADE

||||||| Areas which would be included in the next higher grade.

Area which would be changed from Good to Standard.

---

**10.** The statutory grant of power to the Department of Agriculture found in 7 U.S.C. § 1622(c) and (h) is as follows:

"(c) To develop and improve standards of quality, condition, quantity, grade, and packaging, and recommend and demonstrate

The Department's stated purpose in narrowing the Good grade was as follows:

"Only a small percentage of the beef that qualifies for good is federally graded. This limited use likely is due to retailers' belief that the beef in the present good grade is more variable than is acceptable to their customers. Some of the beef now eligible for the good grade is produced from cattle fed and managed to produce choice grade beef. At the other extreme, it also includes beef which actually has only standard grade quality and qualifies for good only because it has a relatively superior development of conformation. The Department has a responsibility to modify the 'width' of a grade when experience indicates such is needed to make it more acceptable and useful and it believes there is adequate justification for making the good grade more restrictive than it is at present. This change will make good grade beef very uniform and should encourage its greater acceptance and use by retailers and consumers. The revised good grades could be especially useful if the trend continues, as some expect, of shorter feeding periods for cattle to reduce fatness and costs." *Statement of Considerations,* 40 F.R. 11535.

The Department of Agriculture proposes to narrow the Good grade in the effort to achieve its desire for uniformity by doing three things. First, the Department proposes to eliminate conformation as a factor in the grading of beef for all grades. The Department of Agriculture asserted that its study revealed that conformation caused beef of otherwise similar quality to be graded differently. It observed that eliminating conformation would cause the Good grade to become more restrictive. Second, the Department of Agriculture proposes to reduce the marbling requirement for the Choice grade. The reduced requirement to achieve Choice grade would be accomplished along the bottom line of what is presently the Choice grade so that meat which now falls in the higher range of the old Good grade will qualify for the higher grade of Choice, thereby narrowing the Good grade.

The narrowed Good grade would be further reduced by increasing by ½ degree its marbling requirement for beef in the A minus maturity range. That is, beef containing traces of marbling and of A minus maturity now qualifies for the Good grade but under the proposed regulation will not do so.

Plaintiffs point out there is an inconsistency in the rationale employed to widen the Choice and Prime grades and the rationale used to justify the narrowing of the Good grade. That is, that USDA relied upon scientific data suggesting that the old faith in the necessity of maintaining a correspondence between marbling and maturity was, at least in beef of the younger A maturities, no longer warranted, to justify both increases and decreases in marbling requirements.

The Department of Agriculture stated in the *Statement of Considerations*:

"Most of the recent research applicable to the marbling-maturity relationships supports the concept that, for beef from cattle up to about 30 months of age, changes in maturity do not have a sufficiently significant effect on palatability to justify an increase in marbling—Berry, et al (J. Animal Science 38:507); Romans, et al (J. Animal Science 24:681); Breidenstein (J. Animal Science 27:1532); McBee (J. Animal

such standards in order to encourage uniformity and consistency in commercial practices.

"(h) To inspect, certify, and identify the class, quality, quantity, and condition of agricultural products when shipped or received in interstate commerce, under such rules and regulations as the Secretary of Agriculture may prescribe, including assessment and collection of such fees as will be reasonable and as nearly as may be to cover the cost of the service rendered, to the end that agricultural products may be marketed to the best advantage, that trading may be facilitated, and that consumers may be able to obtain the quality product which they desire, except that no person shall be required to use the service authorized by this subsection. . . . "

Science 26:701); Covington, et al (J. Animal Science 30:191); and Norris, et al (J. Food Science 36:440)."

The Department in the same *Statement of Considerations* also stated:

"The changes in marbling-maturity relationships will not significantly change the eating characteristics of prime and choice grade beef. The changes are based on the latest available research relative to the effects of marketing and maturity on the palatability of beef. These studies indicate that in beef from cattle up to about 30 months of age (A maturity) changes in maturity have no significant effect on beef palatability. As a result, the increases in marbling with increases in maturity provided in the present standards for such beef are not necessary to insure a comparable degree of palatability . . . ." 40 F.R. 11535.

The USDA's reply is murky but appears to be that there may be some inconsistency in the application of the marbling-maturity relationship scale but that it was here necessary to gain uniformity in standards. According to USDA the plaintiffs' proposed changes in the relationship between marbling, maturity and quality would be graphically depicted as follows:

# PLAINTIFF'S PROPOSED CHANGES IN THE RELATIONSHIP BETWEEN MARBLING, MATURITY, AND QUALITY

||||||| Area which would be changed from Standard to Good.

It appears, however, that the USDA's purpose in increasing by ½ degree the marbling requirement for meat of A –maturity to qualify for the Good grade was to do more than obtain neat parallelograms for the graphical depiction of its standards.

Obviously changes in one grade must be coordinated with changes in other grades, otherwise there could be no uniformity among the grades. Uniformity is necessary to obtain predictability of quality by grade designation. Uniformity of standards thus increases the clarity of the signal from the consumer to the purchaser as to their demands. At least one benefit of this increased communication is more efficient production as cattle are fed to more precisely determined demands.

The Secretary found that much of the beef that would have qualified for the upper part of the Good grade (the equivalent of about one degree of marbling) is ungraded and merchandised under private labels. Industry is thus making the economic judgment that the upper range of Good is of a sufficiently different quality from meat of the lower portion of Good that it is more profitably merchandised without labeling. At the same time some beef in the lower ranges of the old Good grade were also separated by industry from other meat within the Good grade. There is little question as to the rationality of the USDA's assertion that allowing the Good grade to continue in its present width would perpetuate the now weak economic communication between the consumer and the purchaser with regard to meat of this quality. This industry segmentation of the present Good grade was illustrated by the testimony of Jack Evans, Sr., the president of the Tom Thumb Stores, a large retail food chain in Dallas. Mr. Evans explained that his stores were "quality" merchandisers and his buyers were instructed to purchase only "upper" U. S. Good, not lower U. S. Good.[11]

Consumers were also urging the Secretary to adopt a new grade of meat leaner than Choice and uniform in quality. The decision was instead to widen the band of Choice to include some of the present "upper good grade" and to narrow the Good grade to a more uniform range of quality. That uniformity, in the judgment of the Secretary, required the increase by ½ degree in marbling here complained of. To not do so, according to the Secretary, would allow the baby beef now being fed to the lower range of Good to continue under the U. S. Good label, yet that beef is dissimilar from the other meat which would fall within the new grade of Good.[12]

## CONCLUSION

It is essential that this case be placed in its proper perspective if the court's decision is to be understood.

 First, this is a judicial review of administrative action taken in a complex field. The Congress has delegated power to the Secretary of Agriculture to utilize the department's expertise to achieve broad congressionally defined goals. This court is not competent legally, or otherwise, to substitute its judgment for that of the Secretary of Agriculture. It is to call foul only when the broad boundaries of power and discretion accorded the Secretary have been exceeded. Those boundaries are defined by whether "the decision was based on a consideration of the relevant facts and whether there has been clear error of

---

11. It also follows that the baby beef now being sold in his stores would bear the U. S. Good grade even under the proposed new Good.

12. Whether this marbling increase was necessary to achieve the desired uniformity is obviously critical. Dr. Tyler of the USDA testified that the administrative record contains scientific evidence supporting his claim of dissimilarity. If there, in fact, is not such evidence or if the evidence is to the contrary, the Secretary's decision could become arbitrary and capricious, in that it would be unrelated to the objective of narrowing the Good grade. The court at this stage accepts this testimony.

judgment". Otherwise stated, the scope of review by this court is exceedingly narrow. Courts must resist the flattering suggestions of omniscience implicit in the very process of judicial scrutiny of administrative expertise. There is a grave risk that in discharging the judicial duty to scrutinize the administrative action the judicial body will be invaded by an ill equipped legislative-executive spirit. Draped in robes and augustly clothed in power he may be, the plain fact is this court is just a man who only a few hours ago knew less about meat grades than his wife who makes the family purchases. There is no apology for this ignorance. It is mentioned as a reminder that real pragmatic reasons underlie the principles which limit the power of this court to review administrative action. In sum, judicial power must here be exercised with reluctance and genuine trepidation.

Second, this court has had less than forty-eight hours to attempt a review of a record which has taken over a year to develop and whose bulk requires a large four wheeled dolly to even move.

Third, this is an application for a preliminary injunction controlled by a familiar standard for issuance. The standard is phrased differently by different courts but with no perceptible legal differences in application. The plaintiffs must prove to be "reasonably certain to prevail at trial". *Symington Wayne Corp. v. Dresser Industries, Inc.*, 383 F.2d 840, 841 (2d Cir. 1967), or make a "clear showing of probable ultimate success". *Jacobsen Mfg. Co. v. Sterling Precision Corp.*, 282 F.Supp. 598, 603 (E.D.Wis. 1968).

This court is not satisfied that given the same decision to make he would have reached the same conclusion as the Secretary. Yet this court cannot say that at a trial on the merits there is a probability that plaintiffs can demonstrate that the Secretary's decision was a clear error of judgment or at this juncture that the plaintiffs have a probability of demonstrating that the proposed rules they contest are not "reasonably related to the purposes of the enabling legislation." ' *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318, 330 (1973).

Someone must decide where the bottom line of the Good grade will be drawn. Admittedly there is no certainty that the elimination of conformation and the reduction of the marbling requirement for Choice grades will not themselves achieve the desired for width of the new Good grade. While the court might well have stopped there in narrowing the Good grade, at least until experience dictated a different course, the Secretary has considered this alternative and concluded otherwise. He has determined that the bottom line of the new Good grade must be flattened by the ½ degree increase in marbling in meat of A –maturity.

This court is satisfied that the Secretary was aware of the baby beef industry but is skeptical of the Secretary's present claims that during rulemaking it understood its full impact. Moreover, the court cannot but suspect that some of the explanations (see Tyler affidavit) are not post hoc rationalizations. The Department at times claimed to be responding to consumer forces in its defining of new grades, yet these forces were not felt until after the notice period and these proposed regulations never changed during rulemaking.

Plaintiffs have urged that any uncertainties of the court should be resolved in favor of an injunction; this the court cannot do. The burden is upon the plaintiffs and at least at this stage it has not been met.

The Department of Agriculture should take heed. This court will resolve these questions as it studies this record. It will not hesitate to act strongly, if with the fullness of time it finds, contrary to its expectations, the Department to have been out of bounds. A plea by the Department at that time that the difficulty of undoing what has been done should weigh against these plaintiffs may well fall upon unreceptive ears.

Why these regulations should be pressed into action with the Omaha case unsettled and this case soon coming to trial is a matter of administrative decision. This court cannot know with the pressures of time placed upon it the full answers to these concerns. It will know before this case ends.

In the implementation of national standards one's eye should not be parochial, but it must be alert to every opportunity to accommodate "local" interests. A standard promulgated in disregard of its impact through intention or ignorance may be uniform, but it is hardly a national standard.

It is unnecessary to decide whether this informal rulemaking should be reviewed by a "substantial evidence" standard. Under the unique circumstances of this case, and its present preliminary posture, the same result is reached under both the "arbitrary and capricious" and "substantial evidence" standards.

For these reasons the application for temporary injunction is denied. This case will be set for trial on the merits within 45 days.