INDEPENDENT MEAT PACKERS AS-
SOCIATION, an unincorporated
association, Plaintiff,

National Association of Meat Purveyors,
an unincorporated association,
Plaintiff-Intervenor,

National Livestock Feeders Associa-
tion, Plaintiff-Intervenor,

National Restaurant Association,
Plaintiff-Intervenor,

Consumer Federation of America
et al., Plaintiffs-Intervenors,

v.

Earl L. BUTZ, Individually and in his ca-
pacity as United States Secretary of
Agriculture, et al., Defendants,

American National Cattlemen's Associa-
tion, a corporation, Defendant-
Intervenor.

Civ. No. 75-0-105.

United States District Court,
D. Nebraska.

May 29, 1975.

Frank F. Pospishil, Ben E. Kaslow, Omaha, Neb., for plaintiff.

D. C. Bradford, III, Charles L. Titus, Omaha, Neb., for plaintiffs-intervenors, National Assn. of Meat Purveyors and National Restaurant Assn.

James T. Gleason, Omaha, Neb., for plaintiff-intervenor National Livestock Feeders Assn.

Vard R. Johnson, Omaha, Neb., and Girardeau Spann, Washington, D. C., for plaintiffs-intervenors Consumer Federation of America, National Consumers League, Americans for Democratic Action, Consumers Affairs Committee, National Consumers Congress, Public Citizen, Amalgamated Meat Cutters and Butcher Workmen of North America (AFL–CIO), Service Employees International Union (AFL–CIO), American Federation of Teachers (AFL–CIO).

Daniel E. Wherry, U. S. Atty., D. Nebraska, Vincent B. Terlep, Jr., Atty., U. S. Dept. of Justice, Marshall Marcus, Atty., U. S. Dept. of Agriculture, Stephen L. Muehlberg, Asst. U. S. Atty., D. Nebraska, for defendants.

Robert H. Berkshire, Richard J. Wegener, Omaha, Neb., and J. Evan Goulding, Gen. Counsel, Denver, Colo., for defendant-intervenor, American National Cattlemen's Assn.

## MEMORANDUM

DENNEY, District Judge.

This matter comes before the Court for decision subsequent to a hearing held from May 12, 1975 to May 23, 1975. Jurisdiction is founded under 7 U.S.C. § 1621 *et seq.*, 28 U.S.C. § 1331, 5 U.S.C. §§ 702 and 706, and 28 U.S.C. § 1337.

In this action, filed April 1, 1975, plaintiffs seek declaratory and injunctive relief from the promulgation and enforcement of Department of Agriculture rules revising the grading standards for beef. After a hearing on plaintiff's motion for a preliminary injunction, the Court, on April 11, 1975, granted interlocutory relief for the reasons stated in the Court's Memorandum dated April 11, 1975. The order granting the preliminary injunction was appealed to the United States Court of Appeals for the Eighth Circuit, which affirmed on

April 15, 1975, but instructed this Court to conduct:

> . . . a plenary hearing on the request for a permanent injunction and that a final decision of the District Court be rendered within 45 days of this order . . . .

In addition, the Eighth Circuit Court of Appeals instructed this Court to reexamine the adequacy of the bond pursuant to F.R.Civ.P. 65. Thereafter, on April 18, 1975, this Court conducted a hearing on the adequacy of the bond and it was ordered increased from $5,000 to $10,000, due to the high costs of "daily copy" and the likelihood of an expedited appeal.

Since these early proceedings, the Court has permitted four groups to intervene as plaintiffs, and one group to intervene as a defendant. No other motions to intervene were filed, although the Court is aware of actions subsequently filed in other Federal District Courts alleging the same general cause of action.

In accordance with F.R.Civ.P. 52, the Court makes the following findings of fact:

1. Grade standards for beef were originally promulgated in 1926, in which marbling (the size and dispersion of flecks of fat within the meat) was recognized as a major factor in evaluating quality. The first major revision of the grades in 1939 established physiological maturity as an important additional factor in evaluating quality. As a very general rule, increases in marbling have a beneficial effect on quality, while increases in maturity have a deleterious effect on quality. Eight grades are currently used to identify these quality differences—prime, choice, good, standard, commercial, utility, cutter and canner. Uniform palatability (a measure of the tenderness, juiciness and flavor) is the goal of quality grading. In 1965, an additional method of grading was added to identify carcasses and wholesale cuts for their relative yield of retail cuts. This method is called yield grading and consists of five numerical grades (1 through 5), with 1 indicating beef that will yield a high percentage of retail cuts (e. g., lean cattle having minimal fat deposits).

2. Both quality and yield grading have been optional. For example, a packing house could have some of its carcasses quality graded, others yield graded, and yet others both quality and yield graded. At present, approximately 40% of slaughtered cattle are quality graded. Of these, approximately 70% fall in the choice category, 7-8% fall in the prime category, and 22% fall within the good grade. Although the standards for the lower grades (standard, commercial, etc.) are used in the industry as guidelines, very few such carcasses are officially graded due to the expense of grading. Of cattle that are quality graded, approximately 50% are also yield graded.

3. On September 11, 1974, the Agricultural Marketing Service of the United States Department of Agriculture published a notice and draft of revisions to the grades. 7 C.F.R. §§ 53.100–53.105; 7 C.F.R. §§ 53.201–53.206, 39 Fed.Reg. 32743 (Sept. 11, 1974).

4. The proposed rules differed from the old rules in several aspects.

a. Conformation (the shape of the carcass as compared to an ideal shape) was eliminated as a factor in determining quality grade.

b. When officially graded, all carcasses would be identified for both quality grade and yield grade (except for bull carcasses, which are insignificant in number).

c. In the "A maturity" range (young cattle from 9 to 30 months old in age), maturity was eliminated as a factor in determining quality grade. The marbling requirements in the A maturity range were set at the lowest level of marbling previously acceptable within the particular grade.

d. In the "B maturity" range (older cattle from 32 to 48 months old in age), the marbling requirements were reduced one full "degree of marbling" for prime and choice.

Item "c" above is of particular importance, as it involves two decisions. The elimination of maturity as a factor implies that the old formula was in error. Under the old standards, as the maturity increased, the palatability increased. The bottom line of a grade should, of course, indicate uniform palatability along the line. Once the Department decided to correct the bottom lines of the grades within the A maturity range, it was faced with a second decision: whether to set the new standard at the lowest palatability acceptable under the old standards, to set the new standard at the higher palatability required of the more mature cattle in the "A" range, or to set the new standard somewhere in between. The department chose to set the new standard at the lowest palatability previously acceptable in that grade. Thus, under the new standards, the consumer will receive "choice" graded meat having a palatability no worse than the minimum palatability possible under the old standards for "choice."

PROPOSED CHANGES IN THE RELATIONSHIP BETWEEN
MARBLING, MATURITY, AND QUALITY GRADE

|||||| Areas which would be included in the next higher grade.
▨▨▨ Area which would be changed from Good to Standard.

5. The Court has examined the following references cited by the Department in the Statement of Considerations preceding the rules 40 Fed.Reg. 11535:

a. Berry *et al.*, (J. Animal Science 38:507)

b. Romans *et al.*, (J. Animal Science 24:681)

c. Breidenstein, (J. Animal Science 27:1532)

d. McBee and Wiles, (J. Animal Science 26:701)

e. Covington *et al.*, (J. Animal Science 30:191)

f. Norris *et al.*, (J. Food Science 36:440)

These references convince the Court that the Department had substantial evidence upon which to decide to change the maturity-marbling relationship, and to fix that change at the levels reflected in the new rules.

6. The comments received by the Department were very extensive, and in the light most favorable to the defendants were as follows:

a. Approximately 40% of the comments opposed the change in the marbling-maturity requirements.

b. Approximately 25% of the comments opposed the requirement of compulsory yield grading.

c. There was no significant opposition to the elimination of conformation as a factor in quality grading.

7. Executive Order Number 11821, 39 Fed.Reg. 41501, was signed on November 27, 1974.

8. During the earlier proceedings in this Court, all parties represented that Exhibit B to Defendants' Objections to Issuance of a Preliminary Injunction (Filing #4) was the inflationary impact statement required by Executive Order 11821. In the Court's prior Memorandum, the Court stated its doubt that this document was sufficient. The Court has been subsequently informed that counsels' assertion was in error. The Eighth Circuit Court of Appeals was apparently also misinformed on this fact. The Court recognizes that counsels' error was unintentional and no doubt caused by the speed at which this lawsuit progressed. By way of clarification, there are three documents of interest:

a. An "inflation impact evaluation" which is prepared by the agency before taking "major" action.

b. A "summary" of the inflation impact statement which is prepared by the agency and forwarded to the Office of Management and Budget (See Exhibit #6, ¶ 5(d)).

c. A "certification" that the inflationary impact has been studied, which must accompany the rules. In this case, the certification was included at the end of the rules as promulgated, 40 F.R. 11535.

The "summary" required in (b) above is Exhibit #901, a letter from E. L. Peterson (Administrator, Agricultural Marketing Service) to Don Paarlberg (Director Agricultural Economics) which was received by Mr. Paarlberg on March 6, 1975, and forwarded to the Council on Wage Price Stability. This was the document the Court thought was the impact statement itself.

The Court has not been presented with the "evaluation" itself. However, Exhibit #901 contains the following statement:

An analysis of the economic impact of the grade change proposal was made by the Commodity Economics Division, Economic Research Service. While the primary thrust of the study was not directed at assessing the inflationary impact of the proposal, its authors found that most of the supportive reasons for the proposal have a foundation in economics and actual practice. Principal inflation-related findings, as reported in a December 1974 Supplement to the Livestock and Meat Situation Report (Exhibit #3) included: . . .

9. Executive Order 11821 requires a consideration of the following inflation related factors:

a. Cost impact on consumers, businesses, markets, or Federal, State or Local Government.

b. Effect on productivity of wage earners, businesses or governments at any level.

c. Effect on competition.

d. Effect on supplies of important products or services.

Circular No. A-107 (Exhibit #6) implementing the executive order, required the appointment of a "compliance officer"; such was not done until March 18, 1975. The Court does not view this delay as substantive, but the fact that a compliance officer was not appointed until after the final promulgation of the rules on March 12, 1975, indicates a serious disregard of the requirements of the executive order.

10. Exhibit #3, contains an analysis of the following pertinent factors:

a. The potential of compulsory yield grading to improve pricing accuracy.

b. The probable lowering of price to the consumer of choice grade meat if the supply thereof should "increase dramatically."

c. That retailers will probably have to adjust their buying practices—especially if they had been marketing ungraded "good" meat under a house brand.

d. That packers may find it necessary to be more selective in their buying practices to account for the premium placed on yield grades.

e. That feeders can expect to "feed to choice" in fewer days.

f. That beef production will increase in efficiency.

g. That cattle will be marketed at lower weights, necessitating more cattle to meet demand.

h. That the feed needs of the extra cattle described above would be supplied by the feed saved by feeding for fewer days.

11. Under the old regulations, quality grading was done by official United States Department of Agriculture Graders. For this service, the packing house was charged $14.60/hour. The graders grade approximately 70 carcasses per hour—thus the cost of grading a carcass is approximately $.20 for a typical 600 pound carcass; quality grading costs .033¢ per pound. This cost reflects only the U.S.D.A. fees for the quality grading. In addition to these fees, the packinghouse must employ a "rollerman" who applies the stamps under the direction and control of the official grader. The rollerman is not employed by the U.S.D.A.; rather, he is furnished by the packinghouse to assist the official grader and thereby reduce the time (and fees charged) for the grading. Rollermen typically earn approximately $5.00/hour.

The Court finds that the plaintiffs' grading costs will roughly double under the new regulations. Other packers will experience higher costs, the exact amount depending on the proportion of their output that has been yield graded under the old regulations. While the price per pound is relatively insignificant, the high volume of meat processed results in a significant cost to the packer. (See Exhibit #21).

12. Under the old regulations, quality grade marks were hand stamped on the carcass in four locations. Each grader used a stamp which included his initials. To indicate "good" the grader would place one stamp in each of the four locations. "Choice" was indicated by two hand stamps in each of the four locations. Likewise, "prime" required three stamps in each of the four locations. Once the grader had stamped the carcass, the rollerman would apply the rollermarks to each side of the carcass. The yield grade was hand stamped in four locations on the carcass.

Under the new regulations, there are two methods of grading, the first of which is intended for packing plants us-

ing a "rail" (an overhead rail from which the carcasses are hung and moved manually to work stations). This method requires that the grader hand stamp for quality in two locations and for yield grade in ten locations. The rollermarkings are applied in the usual manner and indicate only the quality grade.

The second method under the new regulations is designed for packing plants using a "chain" (similar to a "rail", but where the carcasses are moved automatically to the workstations). The grader hand stamps for quality in two locations, and for yield in two locations. This method uses a rollermark containing both quality and yield marks. (See Exhibits #902–905).

Under the old regulations, it was mandatory to rollermark the brisket, while under the new regulations that is optional.

13. The Court finds that the plaintiffs will suffer more than Ten Thousand Dollars ($10,000.00) in increased costs, due to increased grading expense, exclusive of interest and costs, should the regulations in question become effective. (See Exhibit #21).

14. There is evidence before the Court, although not in the administrative record, that consumer preference closely parallels "palatability", as that term is defined by the Department. All of the Department's research was in terms of "palatability" (as determined by trained taste panels and various mechanical tests for shear forces and the like)—*there was no recent research relating to what actual consumers desire.* In sum, the Department hypothesized a consumer whose only desire was palatability—and then tested for palatability. While this is not a totally unreasonable assumption, the Court finds no evidence in support, save Exhibit #25, a test conducted in 1961.

15. Several cities require that all meat sold at the retail level be quality graded. One such city is Chicago, where a significant proportion of the plaintiffs' output is sold.

16. Although not in the administrative record, the Court was presented with evidence derived from U.S.D.A. publications to the effect that there was a slight increase in retail price following the change in the regulations in June, 1965. In addition, the same data shows a substantial increase in the proportion of meat falling in the "choice" grade. The 1965 changes in the marbling maturity relationship were similar in direction and degree to the proposed regulations in issue in this case. The Court does not give this evidence great weight, due to the complex economic factors which determine retail meat prices. *There is, however, no evidence in the administrative record indicating a factual basis for the Department's conclusion that prices would drop at the retail level.* The Supplement to the Livestock and Meat Situation (December 1974), Exhibit # 3, concluded that:

> The consumer could be indirectly affected by a lower relative price of choice if the supply of choice should increase dramatically due to the change, and by lower prices in general if efficiency of the industry is improved.

The Court finds this conclusion deserving of little weight, as it is based on meager facts, simplistic economic reasoning, and is contradicted by the past experience of the 1965 changes.

17. Immediately after a head of cattle is killed and the hide removed, it is inspected for health and sanitation purposes; *see,* 21 U.S.C. § 601 *et seq.* At this time, the inspector, a U.S.D.A. official, often requires that grubs and bruises be cut out of the exterior fat covering. If more than a minor amount of fat is removed, yield grading is not permitted, as the fat thickness is an important factor in the yield grade equation. For reference, that equation is:

$$Y = 2.5 + 2.5T + .2P + .0038W - .32A$$

where

Y = Yield Grade (Decimal digits dropped, not rounded—e. g. 2.9 becomes 2)

T=Adjusted thickness of fat over rib-eye (inches)

P = Percent kidney, pelvic and heart fat

W = Hot carcass weight (lbs.)

A = Area of ribeye (square inches)

Under the old regulations, even if extensive amounts of fat were trimmed, the carcass was eligible for quality grading. The new regulations prohibit any grading in such a situation.

Some packers customarily trim fat while the carcass is on the kill floor. This trimming involves at most 10 lbs/head and is done to improve the appearance of the carcass.

18. Cattle feeders customarily sell to packinghouses on a "live weight basis", meaning that a buyer examines the live cattle and agrees to pay a certain price per pound of live weight. Occasionally, cattle are sold on a "grade and yield basis", whereby the purchase price is dependent on the quality and yield grades of the carcass, as determined after the cattle is slaughtered and dressed. *There is no evidence in the administrative record, or otherwise, that the practice of selling on a live weight basis will change.*

19. Cattle buyers are adept at assessing the yield grade of live cattle, and consider yield grades when arriving at an average price per pound (live weight basis) of a pen of cattle.

20. For carcasses of the same quality grade, there is a price spread between carcasses having different yield grades. This price spread varies, depending on market conditions, and the exact figures are published on a daily basis in readily available market newsletters and the like. (See Exhibit #31).

21. *There is no evidence which directly, or by inference, tends to show that consumer preferences will be reflected back through marketing channels to producers to a greater extent* under the new regulations.

## CONCLUSIONS OF LAW

In accordance with F.R.Civ.P. 52(a), the Court makes the following conclusions of law. Before the trial of this case, motions for summary judgment were made by Consumer Federation of America, *et al.* (Filing #54); Earl L. Butz, *et al.*, (Filing #57); American National Cattlemens Association (Filing #59); and the Independent Meat Packers (Filing #69). These motions were taken under advisement due to the 45 day limitation imposed on this Court. The decision herein will dispose of the issues raised in the several motions.

■ The Court finds that it has jurisdiction to hear this matter pursuant to 5 U.S.C. § 702, 28 U.S.C. § 1331, and 28 U.S.C. § 1337. See *Stark v. Wickard,* 321 U.S. 288, 290, 64 S.Ct. 559, 88 L.Ed. 733 (1944). Plaintiffs have adequately alleged "standing" within the teachings of *United States v. S. C. R. A. P.,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

### Compulsory Yield Grading

The first substantive issue for consideration pursuant to 5 U.S.C. § 706(2)(A), is whether "compulsory yield grading" falls within the authority delegated by Congress. 7 U.S.C. § 1622(h) states as follows:

(The Secretary of Agriculture is directed and authorized) . . . to inspect, certify, and identify the class, quality, quantity and condition of agricultural products when shipped or received in interstate commerce, under such rules and regulations as the Secretary may prescribe, including assessment and collection of such fees as will be reasonable and as nearly as may be to cover the cost of the service rendered, to the end that agricultural products may be marketed to the best advantage, that trading may be facilitated, and that consumers may be able to obtain the quality product which they desire, *except that no person shall be required to use the service au-*

*thorized by this subsection.* . . . (Emphasis added).

The defendants contend that "the service" means the collection of all grading standards authorized by this subsection. They conclude that Section 1622(h) permits a regulation requiring that all quality graded meat be also yield graded, and vice-versa. Both the wording of the statute and its legislative history are unclear. When this section was debated, Congress apparently did not anticipate the possibility of grading for yield. See 46 U.S.Code Cong. Service 1584 (1946); 92 Cong.Rec. 9022–9033 (July 15, 1946).

The Department of Agriculture's own construction of Section 1622(h) is as follows:

7 C.F.R. § 53.1(p): *Grading Service.* The service established and conducted under the regulations for the determination and certification or other identification of the class grade or other quality of livestock or products under standards.

7 C.F.R. § 53.4: *Kind of Service.* Grading service under the regulations shall consist of the determination and certification and other identification, upon request by the applicant, of the class, grade, or other quality of livestock or products under applicable standards . . . .

Under U.S.D.A. definitions, both the quality and yield standards are considered as measures of "quality". See 7 C.F.R. § 53.1(nn) and (mm). Yield grade, which measures the relative proportion of the weight of trimmed retail cuts to the weight of the carcass is more properly a measure of "quantity." Although the Court is aware of the Secretary's definitions to the contrary, and the proper weight to be accorded that definition, the Court finds the Secretary's construction unfounded. The defendants, in their brief, concur in the Court's determination that yield grading is a measure of quantity.

Against this background, the exception in Section 1622(h) takes on a new light. Essentially, the Department has placed a precondition on the right to refuse either yield grading or quality grading. Defendants contend that the use of the phrase "the service authorized by this subsection" encompasses all possible grading services—that the Department is permitted to "bundle" the services together and required that an applicant take or refuse the entire "bundle". The Court finds this construction of Section 1622(h) erroneous when considered in light of the Department's own definitional regulations, and the voluntary tone of Section 1622. In addition, the Court finds no necessity for compulsory yield grading, as a substantial proportion of all meat is yield graded under the old regulations and no appreciable benefit will result from compulsion. (See Findings #18–21).

■ The Court recognizes that there exists an economic compulsion to have choice grade meat graded as such—the certification as "choice" increases the value of the meat. This form of compulsion is not forbidden by Section 1622(h), and is the type of compulsion that makes a voluntary system viable. It is the tying of yield grade to quality grade which the Court finds in excess of statutory authority.

For these reasons, the regulations relating to compulsory yield grading will be set aside pursuant to 5 U.S.C. § 706(2)(A).

*Executive Order No. 11821*

■■ The second issue for consideration is the adequacy of the Department's actions relative to Executive Order No. 11821. As stated in *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 585, 72 S.Ct. 863, 866, 96 L.Ed. 1153 (1952), "The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself." In this regard, the Court has considered Article II, Section 3, of the United States Constitution, which states as follows:

(The President) shall from time to time give to the Congress Information

of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient . . . (and) . . . he shall take Care that the Laws be faithfully executed . . . .

This section, by necessity, gives the President the power to gather information on the administration of executive agencies. The information and analysis required by Executive Order No. 11821 would also be helpful in recommending new legislation. The Court has, in addition, considered 7 U.S.C. § 1621, the Congressional Declaration of Purpose of the Agricultural Marketing Act of 1946. That section states as follows:

> . . . In order to attain these objectives, it is the intent of Congress to provide for . . . (3) an integrated administration of all laws enacted by Congress to aid the distribution of agricultural products through research, market aids and services, and regulatory activities, to the end that marketing methods and facilities may be improved, that distribution costs may be reduced and the price spread between the producer and consumer may be narrowed . . . with a view to making it possible for the full production of American farms to be disposed of usefully, economically, profitably, and in an orderly manner.

This section thus requires much the same analysis of costs and economics as required by the executive order. *Youngstown* is readily distinguishable, as that case involved the seizure of property for public use, an action of magnitude and one in conflict with constitutional principles respecting private property. Here, the executive order is supported by, and not in conflict with, constitutional language, and is within the Congressional purpose of the Agricultural Marketing Act of 1946.

■ The defendants contend that even if the executive order is valid, it is a mere "housekeeping" order, enforceable only by the President. The Court

might be inclined to agree with the defendants' proposition, except for the previously stated Congressional purpose. That statutory directive, combined with the substantive nature of the executive order, convinces the Court that the Order is more than a housekeeping order and falls within the judicial review contemplated by 5 U.S.C. § 706. *See, e. g., Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); *Brookhaven Housing Coalition v. Kunzig,* 341 F.Supp. 1026 (E.D. N.Y.1972).

■ There is no doubt that the Department's analysis of the inflationary impact did not consider the effect of the new regulations on:

  (a) The productivity of wage earners
  (b) Competition
  (c) Employment
  (d) Energy resources
  (e) Secondary markets (e. g. grain)

In addition, the Department did not weigh the inflationary impact of the alternative proposals submitted by consumers and others. Nor was there a quantification of those factors the Department did consider. While the Court recognizes that prognostication of inflation is subject to inaccuracies and is at best a difficult task, the Department's conduct falls woefully short of that required by law. In the summary of its analysis, the Department indicated the nature and inadequacies of the analysis with the following language:

> While the primary thrust of the study was not directed at assessing the inflationary impact of the proposal, its authors found that most of the supportive reasons for the proposal have a foundation in economics and actual practice. (See Exhibit # 901).

These facts convince the Court that there was a material and substantial noncompliance with the mandate of Executive Order No. 11821, and that the proposed regulations should be set aside pursuant to 5 U.S.C. § 706(2)(A).

## CONCLUSION

In conclusion, the Court finds instances wherein the action of the United States Department of Agriculture, in promulgating revisions to rules found at 7 C.F.R. §§ 53.102, 53.104, 53.-105 and 53.203 to 53.206, was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law", entitling plaintiffs to injunctive relief pursuant to 5 U.S.C. § 706(2)(A). See, generally *CPC International v. Train,* 515 F.2d 1032; (8 Cir. May 5, 1975).

Although much of this decision rests on uncontroverted facts, there were material issues of fact precluding summary judgment. In addition, the Court required expert testimony to fully understand the content and scope of the proposed regulations.

For these reasons, plaintiffs' prayer for permanent injunctive relief will be granted, and the previously listed motions for summary judgment will be denied by separate order of the Court.