526 F.2d 228
 INDEPENDENT MEAT PACKERS ASSOCIATION et al., Appellees,
v.
Earl L. BUTZ, Secretary of Agriculture, et al., Appellants.
INDEPENDENT MEAT PACKERS ASSOCIATION et al., Appellees.
v.
AMERICAN NATIONAL CATTLEMEN'S ASSOCIATION, etc., Appellants.
 Nos. 75--1486, 75--1541.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 11, 1975.
Decided Nov. 14, 1975.
Rehearing and Rehearing En Banc Denied Dec. 15, 1975.
Certiorari Denied March 22, 1976.
See 96 S.Ct. 1461.
 
 Neil Koslowe, Appellate Sec., Civil Div., Dept. of Justice, Washington, D.C., for appellants.
 D.C. Bradford, III, Omaha, Neb., for Meat Purveyors and National Restaurant Ass'n.
 Girardeau A. Spann, Washington, D.C., for Consumers Groups.
 James T. Gleason, Omaha, Neb., for National Livestock Feeders.
 Frank F. Pospishil, Omaha, Neb., for Independent Meat Packers.
 Richard J. Wegener, of Swarr, May, Smith & Andersen, of Omaha, Neb., and J. Evan Goulding, Denver, Colo., for ANCA.
 Before MATTHES, Senior Circuit Judge, and HEANEY and STEPHENSON, Circuit Judges.
 MATTHES, Senior Circuit Judge.
 
 
 1
 These are appeals from an order of the district court* permanently enjoining the implementation and enforcement of regulations promulgated by the United States Department of Agriculture (USDA) pursuant to § 203 of Agricultural Marketing Act of 1946, 7 U.S.C. § 1622.** The regulations revise official USDA standards for the grades of carcass beef, 7 C.F.R. §§ 53.102, 53.104--.105 (1975), and related standards for the grades of slaughter cattle, 7 C.F.R. §§ 53.203--.206 (1975). Appellee Independent Meat Packers Association (Packers) initiated this action on April 1, 1975 by filing a complaint seeking declaratory and injunctive relief from that part of the revised regulations providing that beef carcasses submitted for quality grading would be automatically graded for yield; in the alternative, the Packers sought declaratory and injunctive relief from the regulations in their entirety. The named defendants were Earl L. Butz, Secretary of Agriculture, Erwin L. Peterson, Administrator of the Agricultural Marketing Service, USDA, and Andrew Rot, Supervisor of the USDA Meat Grading Branch at Omaha, Nebraska (federal defendants). The Packers claimed that the compulsory yield provision of the new regulations,[1] which were to have taken effect on April 14, 1975, was arbitrary, capricious, 'not supported by substantial evidence,' and 'in excess of the power' of the USDA. They further alleged that the revised regulations were issued in violation of Executive Order No. 11821, which requires an evaluation of the inflationary impact of all major legislative proposals, rules, and regulations emanating from the executive branch.[2] The complaint alleged jurisdiction under 28 U.S.C. §§ 1331, 1337 and 5 U.S.C. §§ 702, 706.
 
 
 2
 After a hearing on the application for a preliminary injunction, the district court, being persuaded that there was a reasonable likelihood of success, issued a preliminary injunction on April 11 enjoining implementation of the revised regulations in their entirety upon the posting of a $5,000 bond.[3] The federal defendants then appealed to this court, which affirmed the district court's order granting the preliminary injunction, but remanded the cause for 'a plenary hearing on the request for a permanent injunction' and an expedited decision. Independent Meat Packers Ass'n v. Butz, 514 F.2d 1119, 1120 (8th Cir. 1975) (per curiam). The district court subsequently permitted the American National Cattlemen's Association (ANCA) to intervene as a party-defendant and four groups, the Purveyors, Feeders, Restaurants, and Consumers, to intervene as party-plaintiffs.[4] The allegations of plaintiff-intervenors were substantially the same, except that the Consumers contested principally the new standards for identifying beef quality.
 
 
 3
 Prior to trial the Packers, Consumers, and all defendants filed motions for summary judgment. The federal defendants also moved for an order limiting the scope of the court's inquiry to a review of the administrative record.[5] After a full trial,[6] the district court on May 29, 1975, filed a memorandum opinion incorporating its findings of fact and conclusions of law and an order denying all motions for summary judgment and permanently enjoining enforcement of the revised regulations. Independent Meat Packers Ass'n v. Butz, 395 F.Supp. 923 (D.Neb.1975).
 
 I.
 
 4
 Resolution of the issues raised in this appeal requires a brief review of the history of the beef grading program currently in force. The USDA inaugurated its voluntary beef grading program in May 1927 without express congressional authorization.[7] To promote a scientific approach to the problems of marketing, transporting and distributing agricultural products,[8] Congress in 1946 passed the Agricultural Marketing Act. Under § 203 of the Act, 7 U.S.C. § 1622(h), the Secretary of Agriculture is authorized to 'inspect, certify, and identify the class, quality, quantity, and condition of agricultural products . . ., under such rules and regulations as (he) may prescribe . . ..'[9] Under the beef grading regulations presently in force, 7 C.F.R. §§ 53.100 et seq., the USDA grades beef carcasses on a voluntary fee-for-service basis. Federal graders evaluate beef carcasses for their quality grade and yield grade, but packers may request either one or both of these services. 7 C.F.R. § 53.102(a). The quality grading system presently in effect combines both quantitative and qualitative factors, which are combined to form a final grade. Eight quality grade designations--Prime, Choice, Good, Standard, Commercial, Utility, Cutter, and Canner--are applicable to steer and heifer carcasses. The degree of marbling of intramuscular fat[10] and the physiological maturity[11] of the slaughtered cattle are the palatability-indicating characteristics of the beef. Conformation involves the proportion of meat to bone and of high to low value cuts.[12] To some extent, increased marbling compensates for greater physiological maturity, 7 C.F.R. § 53.102(r), and superior conformation compensates for marbling except in the Prime, Choice, and Commercial grades, 7 C.F.R. § 53.102(s).
 
 
 5
 The yield grade of a beef carcass is determined by considering four factors: the thickness of the external fat, the amount of kidney, pelvic, and heart fat; the area of the ribeye; and the hot carcass weight. 7 C.F.R. § 53.102(u).[13] USDA yield grade designation represents the percentage of the carcass weight that is made up of boneless, closely trimmed retail cuts from the round, loin, rib, and chuck.[14] When the USDA introduced yield grading on a voluntary basis in 1965, only 3 1/2 percent of beef submitted for quality grading was also yield graded. Under the voluntary program presently in force, approximately 70 percent is graded for yield.[15]
 
 
 6
 Acting under the rulemaking power vested in the Secretary of Agriculture by § 203 of the Agricultural Marketing Act of 1946, 7 U.S.C. § 1622(h), the USDA followed the notice and comment procedure outlined by § 4(b) of the Administrative Procedure Act, 5 U.S.C. § 553(c), in promulgating the challenged regulations. First, on September 11, 1974, the USDA filed notice in the Federal Register of proposed changes in standards for grades of carcass beef, 7 C.F.R. §§ 53.102, 53.104--.105, and the standard for slaughter cattle, 7 C.F.R. §§ 53.201--.206. Interested persons were given an opportunity to present written comments, views, and arguments during a ninety-day period ending December 10, 1974.[16] Over 4,000 comments and five petitions containing 7,618 signatures were received from a wide cross-section of the public. After minor modifications, the final draft accompanied by a Statement of Considerations was published in the Federal Register on March 12, 1975 with an effective date of April 14, 1975. 40 Fed.Reg. 11535 (1975).
 
 
 7
 The revised regulations contained four major changes in the standards for grades of carcass beef. First, conformation was eliminated as a factor for determining quality grade. Secondly, all carcasses submitted for grading would be identified for both quality grade and yield grade. Thirdly, having determined that increasing physiological maturity does not affect palatability within the youngest maturity group (cattle nine through thirty months old), the marbling requirements for this group were set at the lowest level previously acceptable in the Prime, Choice, and Standard grades. For the more mature beef in these grades increased marbling is still required to compensate for advancing age, but the minimum degree of marbling required was lowered by one degree. Lastly, to make the Good grade more uniform and restrictive, the Secretary limited this grade to carcasses in the A and B maturity groups and raised the minimum degree of marbling required by one-half degree.
 
 
 8
 The changes in the relationship between marbling-maturity and quality grades were opposed by most consumers, representatives of restaurants, institutions, their suppliers, and some feeders. Their opposition was based on the belief that the changes would impair the palatability of Prime and Choice beef and that consumers would have to pay 'Choice grade prices for Good grade beef.' The requirement that all beef graded be graded for both quality and yield was opposed most strongly by meat packers. They voiced the belief that compulsory yield grading would increase grading costs,[17] impede their ability to market carcasses from which exterior fat had been trimmed, require a complete restructuring of their buying practices, and preclude the grading of certain carcasses. The packers also questioned the accuracy of the USDA yield grade equation, especially its subjective application by federal graders.
 
 
 9
 The cattlemen endorsed the objectives and principal provisions of the regulations. Their studies and experience convinced them that it would be possible to produce fed beef more economically, using less grain, and a shorter average period in the feedlot. Combining quality and yield grading would reward producers of high yielding beef with premium prices as it would tend to eliminate the use of averages in marketing cattle.
 
 
 10
 The district court's memorandum opinion, which was designed to provide the basis for the injunction entered on May 29, considered the major contentions voiced by the opposing groups. First, the court found 'substantial evidence' to support the changes in the relationship between marbling-maturity and quality grade. 395 F.Supp. at 927. This disposed of the principal challenge of the consumer group plaintiffs. Secondly, the court held that 'compulsory yield grading' falls outside the authority delegated to the Secretary of Agriculture by 7 U.S.C. § 1622(h). The court reasoned that the requirement that all beef submitted for grading be graded for both quality and yield is inconsistent with the voluntary tone of § 1622(h). Id. at 931. The court also stated that there was 'no necessity for compulsory yield grading' and that 'no appreciable benefit (would) result from compulsion.' Id. Lastly, the court considered the adequacy of the Department's actions relative to Executive Order No. 11821. Being persuaded that the adequacy of compliance with the terms of the executive order was subject to judicial review, id. at 932, the court ruled that the Secretary's inflation impact statement was deficient and that, accordingly, the regulations should be set aside in their entirety.
 
 II.
 
 11
 Inasmuch as the USDA's alleged failure to comply with the mandate of Executive Order No. 11821 was the broadest ground upon which the district court's order enjoining implementation of the new regulations was based, we shall consider this issue first. Executive Order No. 11821, 39 Fed.Reg. 41501 (1974), requires the Director of the Office of Management and Budget (OMB) to consider the following factors in developing criteria for identifying legislative proposals, rules, and regulations having potential impact upon inflation: cost impact on consumers, businesses, markets, and government; effect on productivity of wage earners, businesses, and government; effect on competition; and effect on supplies of important products or services. The implementing document, OMB Circular No. A--107, also requires consideration of the effect on employment and energy supplies or demand. In accordance with Section 5(d) of the OMB circular, the Secretary certified that the Department had evaluated the inflationary impact of the proposed regulations, 40 Fed.Reg. 11535, 11546 (1975), and forwarded a brief summary of the evaluation to the Council on Wage and Price Stability. The district court found this evaluation to be deficient because it did not consider the effect of the new regulations on the productivity of wage earners, competition, employment, energy resources, and secondary markets, weigh the impact of the alternative proposals submitted, or quantify the factors that were considered. 395 F.Supp. at 932.
 
 
 12
 Presidential proclamations and orders have the force and effect of laws when issued pursuant to a statutory mandate or delegation of authority from Congress. See Gnotta v. United States, 415 F.2d 1271, 1275 (8th Cir. 1969); Farkas v. Texas Instrument, Inc., 375 F.2d 629, 632 n.1 (5th Cir. 1967); Farmer v. Philadelphia Electric Co., 329 F.2d 3, 7 (3d Cir. 1964). Executive Order No. 11821, issued by the President on November 27, 1974, cites no specific source of authority other than the 'Constitution and laws of the United States.' The district court found that the Order was authorized by § 202 of the Agricultural Marketing Act of 1946, 7 U.S.C. § 1621.[18] We disagree. The broad language of § 202 simply states the policy objectives of the Act. The district court additionally relied on article II, § 3 of the Constitution, which states that '(the President) shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient; . . . (and) he shall take Care that the Laws be faithfully executed . . .' This provision alone does not give the executive order the force and effect of law. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587--89, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) completely refutes the claim that the President may act as a lawmaker in the absence of a delegation of authority or mandate from Congress. Appellees contend that the Order was authorized by § 3(a) of the Council on Wage and Price Stability Act, 12 U.S.C. § 1904,[19] which authorizes the President to establish a Council on Wage and Price Stability with the power to monitor the economy and to appraise the inflationary impact of federal programs and policies. We need not determine, however, what role Congress contemplated for the President under the Act[20] because, in our view, Executive Order No. 11821 was intended primarily as a managerial tool for implementing the President's personal economic policies and not as a legal framework enforceable by private civil action. See Kuhl v. Hampton, 451 F.2d 340, 342 (8th Cir. 1971) (per curiam); Manhattan-Bronx Postal Union v. Gronouski, 121 U.S.App.D.C. 321, 350 F.2d 451 (1965). Even if appellees could show that the Order has the force and effect of law, they would still have to demonstrate that it was intended to create a private right of action.[21] See Acevedo v. Nassau County, 500 F.2d 1078, 1083--84 (2d Cir. 1974); Kuhl v. Hampton, supra at 342; Farkas v. Texas Instrument, Inc., supra at 632--33; Farmer v. Philadelphia Electric Co., supra at 9; see also Gnotta v. United States, supra at 1275.[22] Executive Order No. 11821 does not expressly grant such a right. To infer a private right of action here creates a serious risk that a series of protracted lawsuits brought by persons with little at stake would paralyze the rulemaking functions of federal administrative agencies.
 
 
 13
 In summary, we conclude that the President did not undertake or intend to create any role for the judiciary in the implementation of Executive Order No. 11821. We hold, therefore, that the district court erroneously set aside the revised regulations in their entirety because of alleged deficiencies in the impact statement.
 
 III.
 
 14
 Appellants assert that the district court's conclusion that the USDA exceeded its statutory authority in promulgating the disputed regulations is plainly wrong. Specifically, the court found the compulsory yield provision of the new regulations, 40 Fed.Reg. at 11538, which requires that all beef submitted for grading be graded for both quality and yield, to be inconsistent with the voluntary tone of 7 U.S.C. § 1622(h), 395 F.Supp. at 931. As we have seen, under § 1622(h) the Secretary is directed and authorized to 'inspect, certify, and identify the class, quality, quantity, and condition of agricultural products . . . under such rules and regulations as (he) may prescribe.' Section 1622(h) specifically provides that no person be required to use the 'service authorized by this subsection.' The Secretary urges that this language permits him to bundle the Department's grading services together and thus require applicants to either take or refuse the entire bundle.
 
 
 15
 We turn, then, to an analysis of the statute. In matters of statutory construction, we are guided by 'the provisions of the whole law, and . . . its object and policy.' State Highway Comm'n v. Volpe, 479 F.2d 1099, 1111--12 (8th Cir. 1973), citing Richards v. United States, 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). 'The practical inquiry in litigation is usually to determine what a particular provision, clause, or word means,' but to answer it one must refer to the 'leading idea or purpose of the whole instrument.' 2 J. Sutherland, Statutory Construction § 4703, at 336 (3d ed. 1943). The principal purpose of the Agricultural Marketing Act of 1946 was 'to promote through research, study, experimentation, and, . . . cooperation among Federal and State agencies, farm organizations, and private industry, a scientific approach to the problems of marketing transport(ing), and distribut(ing) . . . agricultural products.' 1946 U.S.Code Cong.Service p. 1586. To effectuate the purposes of the Act, Congress in § 1622 delegated a broad range of duties to the Secretary of Agriculture relating to agricultural products.[23] The emphasis the Act places on a scientific approach to solving the problems of the industry suggests that Congress intended the Secretary to freely use his expertise. Consideration of the literal meaning of the words employed sheds additional light on the subject. The key language is 'service authorized by this subsection.' It is presumed that Congress has used a word in its usual and well-settled sense. See Community Blood Bank v. FTC, 405 F.2d 1011, 1015 (8th Cir. 1969). The use of the term 'service' in the singular rather than the plural form supports the Secretary's theory that he can offer the Department's beef grading services as a single 'package.' For the foregoing reasons, we conclude that the Secretary is authorized to use his expertise to combine the Department's beef grading services so long as the program as a whole facilitates the congressional goals set forth in § 1622(c) and § 1622(h).
 
 IV.
 
 16
 This brings us to an analysis of the substantive merits of the new regulations. Appellees contended at trial and assert here that the USDA acted arbitrarily and capriciously in promulgating the revised regulations. They specified three respects in which, in their view, the 'compulsory yield' provision was defective. In addition to the issues previously discussed, their complaints focused upon practical problems inherent in compulsory yield grading, its alleged ineffectiveness, inflationary impact, and asserted inaccuracies in the USDA yield grade formula currently used. They also launched a multi-faceted attack on the new quality grade standards, especially its effect on the palatability of beef and the price of Choice graded beef. Finding 'substantial evidence' to support the new quality grade standards, the district court resolved this issue favorable to appellants. Because appellees failed to file a cross-appeal, they may not now claim that the new quality grade regulations are without sufficient evidentiary support. See Tiedeman v. Chicago, Milwaukee, St. Paul & Pacific R. Co., 513 F.2d 1267, 1272 (8th Cir. 1975).[24] Consequently, the sole issue for our consideration is whether under the applicable standard of review there was an adequate basis in the administrative record for the revised yield grade regulations.[25] Ordinarily, we would remand this matter to the trial court for consideration of the alleged arbitrariness of the regulation, but it is not necessary to do so in this case because the complete administrative record and the transcript of the trial court proceedings are before us. See Environmental Defense Fund v. Corps of Engineers, 470 F.2d 289, 301 (8th Cir. 1972).
 
 
 17
 Appellees concede that under the guidelines enunciated in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), the appropriate standard of review for regulations promulgated pursuant to the 'notice and comment' procedure of the Administrative Procedure Act, 5 U.S.C. § 553(c) (informal rulemaking) is that specified by 5 U.S.C. § 706(2)(A), which authorizes a reviewing court to set aside agency action found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'[26] See National Nutritional Foods Ass'n v. Weinberger, 512 F.2d 688, 700--01 (2d Cir. 1975); National Tire Dealers Ass'n, Inc. v. Brinegar, 160 U.S.App.D.C. 238, 491 F.2d 31, 34--35 (1974); Bunny Bear, Inc. v. Peterson, 473 F.2d 1002, 1005 (1st Cir. 1973); Boating Industry Ass'n v. Boyd, 409 F.2d 408, 411 (7th Cir. 1969).[27] Under the arbitrary and capricious standard of review, the reviewing court is to engage in a substantial inquiry into the facts, but is not empowered to substitute its judgment for that of the expert agency. The court is to consider only whether the disputed regulations were based on 'consideration of the relevant factors' or whether there was a clear error of judgment. Citizens to Preserve Overton Park, Inc. v. Volpe, supra 401 U.S. at 416, 91 S.Ct. 814. See CPC International v. Train, 515 F.2d 1032, 1044 (8th Cir. 1975). To have the regulations promulgated pursuant to the notice and comment procedure of § 553(c) set aside, the opponents must prove that the regulations are without rational support in the record. See First Nat'l Bank v. Smith, 508 F.2d 1371, 1376 (8th Cir. 1974). The reviewing court's inquiry into the facts is further circumscribed by language in Overton Park prohibiting de novo review except when agency action is adjudicatory in nature and agency factfinding procedures are inadequate, or when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action. 401 U.S. at 415, 91 S.Ct. 814. The parties agree that neither situation exists here. Their dispute focuses rather on the extent to which a reviewing court in conducting the 'plenary review' mandated by Overton Park can go outside the administrative record to hear expert testimony on the merits of the disputed regulations.[28]
 
 
 18
 Our consideration of the transcript of the trial court proceedings and the District Judge's memorandum opinion convince us that the district court, while sometimes articulating the correct standard of review, nonetheless exceeded the narrow limits imposed by Overton Park.[29] The district court conducted a ten day evidentiary hearing during which it heard the expert testimony of private individuals and USDA officials on the merits of the regulations and, on the basis of that testimony, independently weighed the evidence and reached its own conclusions. In these respects the district court erred.[30] For example, in concluding that the Packers' grading costs would roughly double under the new regulations, 395 F.Supp. at 928, the district court apparently rejected testimony by David Hallett, Chief of the Meat Grading Branch, USDA and Andrew Rot, Supervisor of the Meat Grading Branch at Omaha, Nebraska, that any increase would be immaterial. Addressing itself to the merits of the new yield grade regulations, the district court found 'no necessity for compulsory yield grading' and that 'no appreciable benefit (would) result from compulsion.' 395 F.Supp. at 931. The full administrative record, which included numerous research studies and over 4,000 comments, and the Department's construction of the evidence, were before the district court. The expert testimony heard at trial offered little that was new. In our view, unless an inadequate evidentiary development before the agency can be shown and supplemental information submitted by the agency does not provide an adequate basis for judicial review, the court in conducting the plenary review mandated by Overton Park should limit its inquiry to the administrative record already in existence supplemented, if necessary, by affidavits, depositions, or other proof of an explanatory nature. See Citizens to Preserve Overton Park, Inc. v. Volpe, note 27 supra; National Nutritional Foods Ass'n v. Weinberger, supra at 701; Bradley v. Weinberger, 483 F.2d 410, 415 (1st Cir. 1973).
 
 
 19
 We proceed to an independent examination of the record to determine whether the Department acted arbitrarily or capriciously in promulgating the regulation. The principal thrust of appellees' argument is that because of alleged inaccuracies in the USDA yield grade equation and its subjective application by USDA graders, compulsory yield grading will not achieve its purpose--to force the wholesale market for beef and cattle to reflect the full retail sales value differences associated with differences in yield. 40 Fed.Reg. at 11536. USDA statistics indicate that for Choice beef carcasses there is between a $5.00 and $6.00 per hundred weight difference in value between adjacent yield grades. Tr., vol. 11, at 1272--73. Under current marketing practices, approximately 75 percent of slaughter cattle is purchased and paid for on a live weight basis. Because the packer-buyer uses a system of averages to bid for a pen of slaughter cattle, producers presently have little incentive to increase the production of high-yielding slaughter cattle. Tr., vol. 13, at 1478--91. It is the Department's view that if the producers were paid a substantial premium for beef carcasses qualifying for yield grades 1 and 2, they would respond by providing leaner beef with less waste. 40 Fed.Reg. at 11536. The administrative record shows and the Secretary concluded that because cattle being slaughtered today are younger and heavier than those marketed when the original yield grade study was made in the late 1950's,[31] the prediction equation currently used may tend to underestimate actual retail yield in certain carcasses, particularly among the 'exotic' breeds. We note, however, that a number of research studies contained in the administrative files indicate that the yield grade system is the most accurate method of estimating retail yield that is both economical and practical for use on a daily basis.[32] Appellees also question the usefulness of compulsory yield grading in light of the fact that, as we have noted, cattle are generally purchased on the hoof rather than on a carcass grade and weight basis. The yield grade stamps are not applied until the cattle are slaughtered, skinned, cleaned, and chilled for approximately twenty-four hours. Thus under existing buying practices the full use of yield grading as a pricing mechanism requires that the packer-buyer be able to subjectively evaluate the retail yield of live cattle with a fair degree of accuracy. Studies by Wilson,[33] Gregory,[34] and Crouse,[35] tend to support the Department's position that subjective live appraisal by trained personnel has predictive value. Appellees place great emphasis on the fact that, in practice, federal graders estimate three of the four factors used in the yield grade equation by means of visual observation. We cannot say, however, that the subjective application of the yield grade equation substantially impairs its accuracy. Under USDA regulations the amount of external fat on a carcass is evaluated in terms of the thickness of the fat over the ribeye, but this measurement must be adjusted to reflect uneven deposition of fat on the carcass. 7 C.F.R. § 53.102(v). The regulations permit and provide for the adjustment which, as a practical matter, must be subjective. Id. The fact that no packer or other financially interested party has ever used the Department's appeals procedure to appeal a yield grade determination[36] convinces us that subjective evaluation of yield grades is not a real problem.
 
 
 20
 We recognize that a compulsory yield grade program may cause a certain loss in flexibility by limiting packers' ability to merchandise certain kinds of carcasses, especially those that are overfat or damaged, and by precluding those packers who customarily trim exterior fat prior to grading from selling such fat as an edible byproduct. Nevertheless, the disadvantages are to be balanced against the expected beneficial effects of the program, including the creation of price signals that will induce producers to shift their resources to the production of leaner cattle.[37] This is precisely the type of situation that calls for the exercise of administrative expertise. Scientists at Texas A & M University's Agricultural Experiment Station recently compiled the data collection phase of a study designed to evaluate the prediction equation currently in use. If the Department concludes, after thorough analysis of the data, that the yield grade system is no longer suitable, the Secretary, under 7 U.S.C. § 1622(c),[38] should revise the regulations accordingly. Appellees argue that the Department acted prematurely in promulgating the new regulations before collection and analysis of the Texas data was complete. Perhaps it would have been more desirable, as a point of procedure, if the Department had waited. We cannot disregard the fact, however, that the research studies previously discussed support the yield grade system currently in force.
 
 V.
 
 21
 We hold that a district court reviewing regulations promulgated pursuant to the notice and comment procedure specified by 5 U.S.C. § 553(c) is not empowered to conduct a de novo hearing. All parties agreed, as did the District Judge, that de novo review was not appropriate. But our examination of the voluminous record of the trial proceedings convinces us that the district court did in fact hold a de novo trial[39] and that the expert evidence relating to the merits of the regulations influenced the District Judge's decision. We have thoroughly reviewed the administrative record with certain explanatory evidence and conclude that the compulsory yield provision of the new regulations cannot be set aside as arbitrary and capricious. For all of the foregoing reasons we dissolve the injunction issued by the district court and remand the case with instructions to enter a judgment declaring that the revised regulations are valid and dismissing the complaints filed by the Independent Meat Packers Association and the intervening plaintiffs.
 
 
 
 *
 The Honorable Robert V. Denney
 
 
 **
 The Secretary and other original defendants appealed on July 2, 1975 (No. 75--1486). American National Cattlemen's Association, intervening defendant, see page 231, infra, appealed on July 23, 1975 (No. 75--1541)
 
 
 [1]
 40 Fed.Reg. 49 (1974)
 
 
 [2]
 Executive Order No. 11821 also directs the Director of the Office of Management and Budget to develop criteria for the identification of major legislative proposals, rules, and regulations having a significant impact upon inflation and to prescribe procedures for their evaluation. Pursuant to this mandate, the Office of Management and Budget on January 28, 1975 sent Circular No. A--107, which prescribes guidelines for compliance with the Order, to the heads of all executive departments
 
 
 [3]
 The bond was subsequently ordered increased to $10,000
 
 
 [4]
 The Purveyors, Feeders, and Restaurants were represented by the National Association of Meat Purveyors, National Livestock Feeders Association, and the National Restaurant Association. The Consumers were represented by the Consumer Federation of America, the National Consumers League, Americans for Democratic Action, Consumer Affairs Committee, National Consumers Congress, Public Citizen, Amalgamated Meat Cutters and Butcher Workmen of North America (AFL--CIO), Service Employees International Union (AFL--CIO), and the American Federation of Teachers (AFL--CIO)
 
 
 [5]
 The court never formally ruled on the government's motion. When the federal defendants argued their motion for summary judgment, however, they reiterated their request, which was orally denied from the bench. Tr., vol. 1, at 40--41
 
 
 [6]
 The ten-day trial generated seventeen volumes of testimony and several hundred exhibits
 
 
 [7]
 United States Department of Agriculture, Agriculture Marketing Service, Official United States Standards for Grades of Carcass Beef 2 (1973)
 
 
 [8]
 See 1946 U.S.Code Cong.Service 1586
 
 
 [9]
 The Secretary is authorized to promulgate regulations 'to the end that agricultural products may be marketed to the best advantage, that trading may be facilitated, and that consumers may be able to obtain the quality product which they desire, except that no person shall be required to use (this) service . . .' 7 U.S.C. § 1622(h)
 
 
 [10]
 The degrees of marbling in the order of descending quantity are as follows: abundant, moderately abundant, slightly abundant, moderate, modest, small, slight, traces, and practically devoid. 7 C.F.R. § 53.102(q)
 
 
 [11]
 The five maturity groups are identified as A, B, C, D, and E, in order of increasing maturity. Id
 
 
 [12]
 Superior conformation, which is generally reflected in a carcass with a full, well-rounded appearance, means that there is a high proportion of meat to bone and a high proportion of weight in the more valuable parts of the carcass. 7 C.F.R. § 53.115(b)(2)
 
 
 [13]
 The USDA yield grade is determined on the basis of the following equation: yield grade -2.50 2.50 adjusted fat thickness, inches) (0.20 percent kidney, pelvic, and heart fat) (0.0038 hot carcass weight, pounds) -(0.32 area ribeye, square inches). 7 C.F.R. § 53.103(a). Yield grades are designated by the numbers 1 through 5. A carcass typical of its yield provides approximately 2.3 percent more boneless retail cuts from the round, loin, rib, and chuck than the next lower (higher number) yield grade. U.S. Dep't of Agriculture, Economic Research Service, Proposed Changes in the Relationship Between Marbling, Maturity, and Quality Grade 3 (Supp. Livestock Meat Situation Dec. 1974)
 
 
 [14]
 See Cross, Equations for Estimating Boneless Retail Cut Yields from Beef Carcasses, 37 J.Animal Science 1267 (1973)
 
 
 [15]
 Approximately 55--60 percent of all beef produced is USDA graded for quality
 
 
 [16]
 Although not required by the Administrative Procedure Act, the Department also conducted regional briefings in five cities
 
 
 [17]
 The packers are billed $14.60 per hour for work performed by federal graders during the daytime. 7 C.F.R. § 53.29(a)
 
 
 [18]
 Section 202 of the Agricultural Marketing Act of 1946, 7 U.S.C. § 1621, reads in pertinent part as follows:
 The Congress declares that a sound, efficient, and privately operated system for distributing and marketing agricultural products is essential to a prosperous agriculture and is indispensable to the maintenance of full employment and to the welfare, prosperity, and health of the Nation. It is further declared to be the policy of Congress to promote . . . a scientific approach to the problems of marketing, transportation, and distribution of agricultural products . . . so that such products capable of being produced in abundance may be marketed in an orderly manner and efficiently distributed. In order to attain these objectives, it is the intent of Congress to provide for . . . (3) an integrated administration of all laws enacted by Congress to aid the distribution of agricultural products through research, market aids and services, and regulatory activities, to the end that marketing methods and facilities may be improved, that distribution costs may be reduced and the price spread between the producer and consumer may be narrowed . . . with a view to making it possible for the full production of American farms to be disposed of usefully, economically, profitably, and in an orderly manner.
 
 
 [19]
 The Wage and Price Stability Act, 12 U.S.C. § 1904 (Supp.1975) reads in pertinent part as follows:
 Sec. 3(a) The Council shall--
 (1) review and analyze industrial capacity, demand, supply, and the effect of economic concentration and anticompetitive practices, and supply in various sectors of the economy, working with the industrial groups concerned and appropriate governmental agencies to encourage price restraint;
 (2) work with labor and management in the various sectors of the economy having special economic problems, as well as with appropriate government agencies, to improve the structure of collective bargaining and the performance of those sectors in restraining prices;
 (3) improve wage and price data bases for the various sectors of the economy to improve collective bargaining and encourage price restraint;
 (4) conduct public hearings necessary to provide for public scrutiny of inflationary problems in various sectors of the economy;
 (5) focus attention on the need to increase productivity in both the public and private sectors of the economy;
 (6) monitor the economy as a whole by acquiring as appropriate, reports on wages, costs, productivity, prices, sales, profits, imports, and exports; and
 (7) review and appraise the various programs, policies, and activities of the departments and agencies of the United States for the purpose of determining the extent to which those programs and activities are contributing to inflation.
 
 
 [20]
 The language of the Act is silent with respect to the President's role other than his authority to appoint the members and chairman of the council. The brief legislative history suggests, however, that '(t)he provisions embodied in the . . . Act represent a license by the Congress to the President to exercise his influence to arrest the inflational spiral.' 120 Cong.Rec. 15,245 (daily ed. Aug. 19, 1974) (remarks of Senator Tower). See generally id. at 15,244--57, 15,261--62, 15,266--80, 15,283--87; id. at 8754--56 (daily ed. Aug. 20, 1974)
 
 
 [21]
 We have grave doubts as to whether under Executive Order No. 11821 appellees have standing to judicially challenge the adequacy of the impact statement. Under the test enunciated in Association of Data Processing Service Organization, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), appellees must allege that they have suffered an 'injury in fact' and that they seek to protect an interest 'arguably within the zone of interests to be practiced or regulated by the statute or constitutional guarantee in question.' 397 U.S. at 153, 90 S.Ct. at 830. Appellees fail to satisfy the 'zone of interests' facet of the constitutional test of standing. As we have noted, the purpose of the Executive Order is to help implement the President's personal economic policies. Appellees have not shown that the order was designed for their benefit. Cf. Acevedo v. Nassau County, supra 500 F.2d at 1082--83
 
 
 [22]
 Contra, Chambers v. United States, 451 F.2d 1045, 196 Ct.Cl. 186 (1971)
 
 
 [23]
 Under §§ 1622(c) and 1622(h), the following goals are relevant: (1) to develop and improve standards of quality, condition, quantity, and grade to encourage uniformity and consistency in commercial practice; (2) to market agricultural products to the best advantage; (3) to facilitate the trading of agricultural products; and (4) to make available quality products to consumers
 
 
 [24]
 Appellees' citation of Bowman Transportation, Inc. v. Arkansas Best Freight System, Inc., 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974), holding that agency findings based on substantial evidence may 'nonetheless reflect arbitrary and capricious action,' is inapposite
 
 
 [25]
 The trial court never reached this question. Its order enjoining implementation of the new regulations was based solely on questions of statutory authority and compliance with the Executive Order. See II and III, supra
 
 
 [26]
 We have already held, under II and III, supra, that the agency action was 'otherwise in accordance with law.'
 
 
 [27]
 See also Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 622 n. 19, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 749, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972); contra, Chrysler Corp. v. Department of Transportation, 472 F.2d 659, 669 (6th Cir. 1972) (applying substantial evidence test)
 
 
 [28]
 In Overton Park the court stated
 (t)hat (plenary) review is to be based on the full administrative record that was before the Secretary at the time he made his decision. But since the bare record may not disclose the factors that were considered or the Secretary's construction of the evidence it may be necessary for the District Court to require some explanation in order to determine if the Secretary acted within the scope of his authority and if the Secretary's action was justifiable under the applicable standard.
 The court may require the administrative officials who participated in the decision to give testimony explaining their action . . . (W)here there are administrative findings that were made at the same time as the decision, . . . there must be a strong showing of bad faith or improper behavior before such inquiry may be made. But here there are no such formal findings and it may be that the only way there can be effective judicial review is by examining the decision-makers themselves.
 The District Court is not, however, required to make such an inquiry. It may be that the Secretary can prepare formal findings .. . that will provide an adequate explanation for his action. Such an explanation will, to some extent, be a 'post hoc rationalization' and thus must be viewed critically. If the District Court decides that additional explanation is necessary, that court should consider which method will prove the most expeditious so that full review may be had as soon as possible.
 401 U.S. at 420--21, 91 S.Ct. at 825 (citations omitted).
 
 
 [29]
 THE COURT: I can tell you right now that I am not going to substitute my judgment for the Secretary, because he has more expertise in this than I do
 All I am going to inquire into is whether he did act within the scope of his authority under the Act and also whether he acted arbitrarily and capriciously.
 Tr., vol. 1, at 54.
 THE COURT: I don't intend to have a de novo review. . . . I want to know if there is substantial evidence to back up whether or not the Secretary acted arbitrarily and capriciously.
 Tr., vol. 1, at 47.
 
 
 [5]
 The Court has examined the following references . . .. These references convince the Court that the Department had substantial evidence upon which to change the maturity-marbling relationship
 
 
 [395]
 F.Supp. at 927
 
 
 [30]
 Appellees' contention that appellants waived their right to object to the admission of evidence in addition to the material contained in the administrative record is without merit. At the outset appellants requested the trial court to limit the scope of the inquiry. Only after this request was denied did trial counsel, as a precautionary measure, call expert witnesses to testify on the merits of the regulations. Even if we were to assume that appellants did in fact consent to a trial de novo, the result is the same. As we have noted, the district court was not empowered to conduct a de novo review
 
 
 [31]
 Murphey, Estimating Yields of Retail Cuts from Beef Carcasses, 19 J. Animal Science 1240 (1960)
 
 
 [32]
 See, e.g., Defendant's Exhibit 616 (variables used in the yield grade equation appear to be the most acceptable among those reported when accuracy, speed, and expense are considered; Defendant's Exhibit 662 (prediction equation using the same factors as those used in the USDA equations predicted percent boneless steak and roast meat with a multiple correlation of 0.97); Defendant's Exhibit 666 (equations containing the variables used in the USDA equation resulted in the highest coefficients of multiple determination for percent of boneless steak and roast meat); Defendant's Exhibit 670 (yield grade is most accurate method for predicting carcass composition, percent fat, and protein that can be readily applied by graders in a slaughter facility on large numbers of animals); Defendant's Exhibit 672 (USDA equation, with a simple correlation coefficient of 0.83, is one of the three most useful equations for predicting retail yield)
 
 
 [33]
 Defendant's Exhibit 601 (concluding that fat thickness, which is the primary factor used in determining yield grade, can be predicted in live animals with moderate accuracy and finding a correlation between live estimated fat thickness and carcass cutability of 0.65)
 
 
 [34]
 Defendant's Exhibit 602 (concluding that approximately 25 to 35 percent of the variation in actual cutability can be accounted for on the basis of live estimates of cutability)
 
 
 [35]
 Defendant's Exhibit 631 (live animal estimates of carcass yield grades accounted for 51 and 65 percent of the variation in carcass yield and percentage of actual cutability
 
 
 [36]
 Tr., vol. 11, at 1268--69
 
 
 [37]
 Community Economics Division, Economic Research Service, U.S. Dep't of Agriculture, Economics of Beef Grades: Present and Proposed (Preliminary Draft November 27, 1974)
 
 
 [38]
 Under 7 U.S.C. § 1622(c), the Secretary is authorized and directed to 'develop and improve standards of quality, condition, quantity, grade, and packaging, and recommend and demonstrate such standards in order to encourage uniformity and consistency in commercial practices.'
 
 
 [39]
 Perhaps our earlier remand for 'a plenary hearing,' 514 F.2d at 1120, motivated the district court to hold a full-scale trial